136 N.J. Super. 40 (1975)
343 A.2d 852
IN THE MATTER OF THE ESTATE OF JERRY J. KOVALYSHYN, DECEASED.
Superior Court of New Jersey, Hudson County Court, Probate Division.
June 26, 1975.
*42 Mr. Norman H. Roth for plaintiff (Messrs. Davis, Roth & Beck, attorneys).
Mr. William E. Andersen for defendant (Jesse Moskowitz, attorney).
DOWDEN, J.C.C.
This matter concerns the disputed ownership of certain funds and their availability for use to satisfy debts of an otherwise insolvent decedent's estate.
Decedent died owning certain shares of a mutual fund, more specifically identified as Certificate No. 458740, National Investors Corporation (hereinafter "the Fund"), title to which is now contested by Marie Kuhn Kovalyshyn as executrix of decedent's estate and by her individually because of her status as the residuary beneficiary under the terms of decedent's last will and testament. The dispute arises because title to the property is claimed by Jaroslav B. Kovalyshyn who was named sole beneficiary of a certain inter *43 vivos trust created by decedent upon the occasion of his having commenced his investment program in February 1962. The trust corpus represents the value of those accumulated fund shares.
The decedent's other assets are insufficient to satisfy the debts resulting from his final illness and expenses incident to his burial and the conclusion of his worldly affairs. However, the date-of-death value of these mutual fund shares is sufficient to satisfy all such obligations and yet leave a balance for payment to its rightful owner, subject to the payment of New Jersey inheritance taxes. The beneficiary of the inter vivos trust asserts ownership to the exclusion of the creditors' claims while acknowledging his state tax obligation. The residuary beneficiary under decedent's probated will also claims title to these proceeds, subject to satisfaction of all estate debts, obligations and inheritance taxes.
The pertinent terms of the declaration of trust and decedent's will must be outlined prior to focusing upon the legal issues. In February 1962 Kovalyshyn agreed to make monthly payments of $100 to Investors Planning Corporation of America (I.P.C.), which amount, after certain agreed deductions, was to be used to purchase capital stock in the National Investors Corporation (the Fund). In short, the investor was buying shares in a mutual fund. He also made a written declaration of trust concerning those fund shares and all accumulations thereto, whereby he acknowledged that he held such shares and accumulations for certain "uses and purposes" and subject to specified "conditions and limitations." The investor settlor agreed to hold the trust estate for the use and benefit of his son Jaroslav B. Kovalyshyn, of the Ukraine in the Soviet Union. The conditions and limitations of this trust included a reservation of the unilateral power to change beneficiaries during the settlor's lifetime, by elimination, substitution or addition. Further, the trust provided for the settlor to receive income and distributions of such fund shares during his lifetime and for the *44 continued investment of same. The agreement terminated upon the death of the investor and distribution was to be made to the named beneficiary. It was specifically stated that the "only interests of any" beneficiary shall be such as expressly conferred and which interests occur upon the death of the settlor.
Finally, the trust agreement states that the custodian of those funds shall regard the settlor as the sole owner of the trust estate until the custodian receives notice of the settlor's death. At that time the named beneficiary shall be regarded as the sole owner, and the custodian is absolved of any liability for the post-death payments to one other than the beneficiary, absent a written notice of the settlor's death. The procedure for changing beneficiaries is set forth in paragraph (4).
The probated will named Marie Kuhn Kovalyshyn as the residuary beneficiary of all assets after payments of all just debts and estate expenses.
This factual episode presents several legal questions: Considering the terms and conditions of the declaration of trust, was a valid inter vivos trust created? Can a settlor change the beneficiary of this trust agreement by a method other than that provided under the terms of that agreement? If a settlor of such a trust dies insolvent, may these trust proceeds be applied to the satisfaction of the settlor-decedent's just debts and estate administration expenses?
The courts of New Jersey have not yet examined a trust instrument such as this in order to determine whether it creates a valid inter vivos trust. This mutual fund alone has 3,800 such standard declarations of trust currently operative in New Jersey. Further, it is reasonable to say that this trust agreement is representative of such agreements utilized by the mutual fund industry in this State. Absent judicial guidance from New Jersey courts, resort to judicial expressions from the courts of sister states and treatise evaluations is necessary and appropriate.
*45 Professor Scott sets the tone when he indicates in his recognized treatise that a trust is a flexible device utilized for the disposition of property. It is unique to our system. The purposes for which trusts may be created are unlimited; there are no technical rules restricting the creations of trusts. 1 Scott on Trusts (3 ed. 1967), § 1 at 3 et seq. This child of equity has grown and evolved through judicial decisions and has been codified in several states. Hence the trust has been used in family and other fiduciary relationships, such as with infants, the senile, the mental incompetent and the spendthrift.
The elasticity and adaptability of the trust instrument is most valuable and desirable, having proven its worth through the test of time and its continuing acceptability in the ongoing evolution of this country's political and economic climate. We have had charitable trusts, insurance trusts and business trusts, and now we have the latest device, the mutual fund inter vivos trust. Inter vivos trusts have involved real and personal property alike.
An express trust is based upon the manifested intent of the settlor; a resulting trust is based upon the presumed or inferred intent of the settlor; a constructive trust is created by court action in order to work out justice without regard to the intent of the parties. The instrument is the outward manifestation of the settlor's intention to create the trust for the benefit of the named beneficiary; to impose upon himself or another as trustee, equitable duties to deal with the property for the benefit of another person. 1 Scott op. cit., § 23 at 190. The retention of the power to invade, to control or to revoke the trust does not invalidate an inter vivos trust once it has properly been created. For all its adaptability, however, the inter vivos trust may not be a substitute for testamentary disposition which takes effect only upon the death of the testator unless the prescribed formalities set forth in the New Jersey Statute on Wills are followed.
*46 Mutual fund inter vivos trusts have been the subject of judicial review in several states. While each case deals with a particular trust instrument, it appears that the following cases reveal sufficient factual statements as to the retained powers, etc., of the settlor to indicate how other courts have dealt with instruments strikingly similar to the one under review here: Farkas v. Williams, 5 Ill.2d 417, 123 N.E.2d 600 (Sup. Ct. 1955); Ridge v. Bright, 244 N.C. 345, 93 S.E.2d 607 (Sup. Ct. 1956); Investors Stock Fund, Inc. v. Roberts, 179 F. Supp. 185 (D.C. Mont. 1959), aff'd sub. nom. Roberts v. Roberts, 286 F.2d. 647 (9 Cir.1961). See also, United B. & L. Ass'n v. Garrett, 64 F. Supp. 460 (D.C. Ark. 1946).
In essence, these cases reviewed and evaluated each of the powers reserved by the settlor and determined that the retention of some or all of the powers did not prevent the creation of a valid inter vivos trust or indicate an intention to the contrary. The views of the highest courts of these states is consistent with the view of 1 Scott, op. cit., §§ 56 to 57.2, and Bogert, Trusts and Trustees (2 ed. 1965), § 103-104. In New Jersey our courts have reviewed each of these powers and ruled that the existence of any or all of them in an inter vivos trust instrument does not invalidate it. However, New Jersey has never reviewed these powers as they appear collectively in this mutual fund. In this case the court deals with an instrument designed to be an express inter vivos trust whereby the settlor intended to create a present beneficial interest in favor of the named beneficiary while postponing his enjoyment thereof until the settlor's death. Further, the settlor manifested his intention clearly, specifically and unequivocally. In light of the past expression of New Jersey courts concerning the legal concept of valid inter vivos trusts and their potential includable powers and limitations, I find that this instrument is consistent therewith and valid. See Wolf v. Wolf, 136 N.J. Eq. 403 (E. & A. 1945); Nat'l Newark & Essex *47 Banking Corp. v. Rosahl, 97 N.J. Eq. 74 (Ch. 1925); Bassin v. Enoch-Pearl Co., 140 N.J. Eq. 428 (E. & A. 1947); Savings, Investment & Trust Co. v. Little, 135 N.J. Eq. 546 (Ch. 1944).
The second question to be resolved is whether decedent effectuated a valid change of beneficiary of the inter vivos trust by the subsequent execution of his probated will. It is undisputed that the settlor had named his son as beneficiary when he executed the declaration of trust and never advised the custodian bank of any change during his lifetime. Plaintiff claims title to these proceeds, asserting that the deceased made her the beneficiary when he executed his will. Plaintiff contends that the settlor relied upon the advice of his lawyer, now deceased, who assured him that a valid change of beneficiary could be made by the execution of a will.
The declaration of trust sets forth this procedure:
The power to change beneficiaries as provided in Article (1) may be exercised from time to time during my lifetime, in my sole and uncontrolled discretion without the consent of any beneficiary, which change or changes shall be effected by an instrument in writing signed by me and delivered to The Bank.
The question to be resolved is whether the deceased's will qualifies as an appropriate written instrument required by the declaration of trust. An examination of the case law indicates that a will is not the proper instrument to revoke or modify a trust when the power to do so is an inter vivos power. In In re Henning's Estate, 116 N.J. Super. 491 (Ch. Div. 1971), it was asserted that the settlor had revoked the trust by her will. The trust agreement contained the following:
The settlor hereby reserves the right to terminate this trust or to modify or amend it at any time or from time to time, by an instrument in writing delivered to the said Trustee during the settlor's lifetime. [at 494]
The court emphasized that the deed of trust specified that any changes must be made during the settlor's lifetime.
*48 The will could not, in the absence of language to the contrary in the deed of trust, be such an instrument in writing because it did not have any legal efficacy until after the death of the testatrix. [at 495]
Restatement, Trusts 2d, § 330, comment (j), is also relevant:
If the settlor reserves a power to revoke the trust only in a particular manner or under particular circumstances, he can revoke the trust only in that manner or under those circumstances.

* * * * * * * *
If the settlor reserves a power to revoke the trust by a transaction inter vivos, as for example, by a notice to the trustee, he cannot revoke the trust by his will. [at 139]
A similar statement is made in § 331 of the Restatement, comment (d) at 144, regarding modification of a trust. Bogert, op. cit., § 993 at 432, also addresses this problem: "If the method of exercising the power of modification is described in the trust instrument, such a provision will control. * * * Notice of amendment to the trustee should be a requirement. * * *"
In Mayer v. Tucker, 102 N.J. Eq. 524 (E. & A. 1928), the husband of the settlor argued that the words "my estate" included a trust over which the settlor had retained a power of revocation. The court found insufficient evidence in the will or extrinsic evidence that the settlor had intended that her will accomplish the alleged result.
It was also held that the will could not revoke the deed of trust since the right of revocation had to be exercised during the life of the settlor. The will referred to "my estate" and the trust deed provided that the settlor "reserves the right and power to revoke the trust hereby created." (At 525-526). The court also held that the words "my estate" did not have any latent ambiguity which would justify the reception of extrinsic evidence.
In another case, Clark v. Freeman, 121 N.J. Eq. 35 (Ch. 1936), it was held that where a husband and wife held a *49 joint power of revocation and the husband renounced his power, the wife could not exercise the power alone. "The power can be exercised only in the manner specified and by the persons to whom the power is given or the attempted revocation is void." (At 36; emphasis supplied).
Plaintiff relies on Bauer v. Crummy, 56 N.J. 400 (1970), to support her position that a will can revoke or modify a trust. That case involved a joint bank account which a woman and her son had opened strictly for her convenience. Although the form they signed provided for survivorship, the Supreme Court allowed a disposition by will of the account to others not including the son. However, the will specifically referred to the joint bank account, and the court also stated that it would allow a testamentary disposition "if he is its sole owner, * * * by an explicit provision of his last will and testament, * * *" (At 413; emphasis supplied). See also, In re Stein's Will, 42 Misc.2d 787, 249 N.Y.S.2d 223 (Surr. Ct. 1964), where an attempted testamentary change of beneficiaries of a trust of the same mutual fund as in the present case was held ineffective. The same result occurred in Ridge v. Bright, supra.
In view of the above case law it is obvious that the execution of a valid will can not accomplish the desired inter vivos change.
Plaintiff seeks equitable relief in this case claiming that the settlor relied upon his lawyer as to the legal effect of his act of executing his will and that such an act was the equivalent of compliance with the requirements of Article (4) of the trust agreement.
Passing the question as to whether equitable relief can be given under these circumstances and examining the proof submitted in support of this proposition, it is the court's conclusion that the record falls far short of the necessary clear and convincing evidence warranting judicial intervention to reform an otherwise valid agreement.
*50 The criteria that must guide the court is established in Brodzinski v. Pulek, 70 N.J. Super. 63 (Ch. Div. 1961), mod. 75 N.J. Super. 40 (App. Div. 1962):
The adjudicated cases, in this State at least, have uniformly held that a court of equity will not grant the high and extraordinary remedy of reformation except upon the production of proof, clear, convincing and free from doubt that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be; and as, in fact, it was but for the alleged mistake in its drafting. The same quantum of proof is required where reformation is sought on the ground of unilateral mistake and inequitable conduct of the defendant with respect thereto. [70 N.J. Super. at 71 emphasis supplied]
In light thereof and having reviewed the testimony, I do not find it persuasive to any degree. It consists of the testimony of plaintiff herself and a will couched in general terms with no reference to the ownership of this Fund upon testator's death. The testimony of plaintiff is not supported by any of the witnesses who were present when the will was executed. The proofs are too meager to support equitable intervention.
The executrix of this otherwise insolvent estate seeks to compel the resisting beneficiary of this trust to contribute an amount necessary to help satisfy decedent's debts and estate obligations. The estate fiduciary asserts a prior right to only that portion of the trust res without which these debts cannot be paid, it being undisputed that the other estate assets are inadequate. Further, there is no assertion or proof that the settlor created this trust fraudulently as to existing or future creditors. The terms of this trust demonstrate conclusively that this is a revocable trust.
Seen in its totality, this trust tolerated almost absolute control, provided the settlor conformed to the terms of the declaration of trust. This is quite similar to savings account trusts which are usually identified as "Totten trusts". Professor Scott speaks of such savings account trusts as "tentative trusts" and seems to distinguish such trusts from those *51 otherwise classified as revocable trusts. 1 Scott, op. cit., §§ 58.2 to 58.5 at 524 et seq. Such savings deposit trusts were the subject of much litigation and ultimately their validity in New Jersey was predicated upon statutory law, N.J.S.A. 17:9A-216 and 46:37-2.
This mutual fund declaration of trust manifests clearly the settlor's intention to create and maintain a trust. Therefore, this trust cannot be classified as "tentative", lest that term indicate a lack of genuine validity as a revocable trust. The savings deposit trust has the same essential characteristics of continued control over the funds. The similarity of both types of revocable trusts calls for a similar interpretation of each type vis-a-vis creditors of the settlor. This is valid because of the inherent flexibility of the trust concept. Making the trust res accessible to the settlor's creditors does not do violence to the trust under these circumstances, anymore than it does in savings deposit situations.
In New Jersey such bank deposits are accessible to a settlor's creditors during his lifetime. Passaic Nat'l Bank & Trust Co. v. Taub, 137 N.J. Eq. 544 (E. & A. 1946). In New York, if such a depositor dies insolvent without revoking the trust, his creditors can reach the trust. 1 Scott, op. cit., § 58.5 at 543, n. 3. This is so because the depositor is considered to have such complete control over the funds during his lifetime that the situation is distinguishable from the ordinary trust where a settlor merely reserves a power of revocation. Such funds are also available to pay his funeral expenses and the expenses of the administration of his estate if his other assets are insufficient for these purposes. 1 Scott, op. cit., at 543-544.
The application of the same legal reasoning and the use of such legal principles in mutual fund trusts is compulsive, given the similarity of each type trust and the firmness of the trust commitment. As circumstances determined, the settlor died impoverished and in debt, needing access to this money to regain solvency. Obviously, decedent did not *52 intend to strip himself of control of or access to these funds during his lifetime, intending only to give to the beneficiary what was left, if anything, at his death. If he had terminated the trust during his lifetime in order to pay his debts, no one could have complained. In effect, the beneficiary says that death cheated the settlor and his creditors of their opportunity to settle these just debts. It is inconsistent with justice or the reality of the situation to accept the beneficiary's argument which, in effect, shelters this asset from accessibility for satisfaction of debts. Under these circumstances the court invokes that ancient equity maxim: "A man must be just before he is generous". Merchants' & Miners' Transp. Co. v. Borland, 53 N.J. Eq. 282 (Ch. 1895).
An appropriate order is to be submitted.